## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                    Crim. No. 21-115 (SRN/BRT)

          Plaintiff,

v.                                                                   **REPORT AND**
                                                                **RECOMMENDATION**
Dywan Lamar Conley,

          Defendant.

---

Amber M. Brennan, Esq., and Harry Jacobs, Esq., United States Attorney's Office, counsel for the United States.

Keala C. Ede, Esq., Office of the Public Defender, counsel for Defendant.

---

This action came before the Court on July 13, 2021, for a hearing on various pretrial motions filed by Defendant Dywan Lamar Conley. (Doc. No. 36.) The Court has since ruled on Defendant's non-dispositive motions. (Doc. No. 38.) Remaining before the Court is Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 22) and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 23).

Defendant is charged in the Indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), namely a Smith & Wesson .38 Special pistol. (Doc. No. 1, Indictment.) Deputy Andrew Dziekan seized the firearm after he was alerted to its presence by a hospital security officer who felt the gun in Defendant's jacket while holding Defendant down during the

administration of medical treatment. After the seizure, Defendant made several statements to police, including to Minneapolis Police Department Officer Cain and Minneapolis Police Department Detective Richard Walker.

Defendant seeks to suppress the firearm and several other pieces of physical evidence found on his person on the grounds that they were obtained in violation of his Fourth Amendment right to be free from unreasonable seizure. (*See* Doc. No. 43, Def.'s Post-Hearing Mem. in Supp. of Mots. to Suppress Statements, Admissions, and Answers and to Suppress Evidence Obtained as a Result of Search and Seizure ("Def.'s Mem.") 25–37.) He also seeks to suppress statements he made immediately after the seizure, including statements made in response to Officer Cain's questions and statements made in response to Detective Walker's questions on the grounds that they were obtained in violation of his Fifth Amendment right to be free from self-incrimination. (*Id.* at 37–44.) The Government opposes the motions. (*See generally* Doc. No. 44, Govt's Supp. Resp. to Def.'s Pretrial Motions ("Govt's Resp.").)

As discussed below, based on the file, record, and submissions by the parties, as well as the applicable case law, this Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 23) be denied and that Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 22) be granted in part and denied in part.

## I.    FACTS

### A.    Discovery of the Gun

In the early morning of April 15, 2021, Defendant was shot in the leg by a gun. He

was dropped off near the emergency room entrance of the Hennepin County Medical Center ("HCMC") in a pickup truck by a man who Defendant reportedly had asked to "run him to the hospital." (Def. Ex. 4 at 04:08:10–04:09:28.) At that time, Deputy Dziekan was working as part of the Hospital Sherriff's Enforcement Unit ("H-SEU")[1] at HCMC when he received a radio call from EMS dispatch that a gunshot wound victim had arrived at the hospital. (Tr. 10–12, 32–33, 37.) Ambulance staff directed Deputy Dziekan to the ambulance bay of HCMC where he and his partner Deputy Jacob discovered the parked pickup truck and EMS staff assisting Defendant onto a gurney. (Tr. 12.) As Defendant moaned in pain, EMS staff rolled Defendant into HCMC's stabilization room, a traumatic medical emergency room where patients receive immediate emergency care for cases that are often life-threatening. (Tr. 13–17, 37; Gov't Ex. 1 at 04:08:20–44.) When Deputy Dziekan walked into the stabilization room, he found the medical staff attempting to give Defendant medical care while Defendant sat upright on a hospital bed. (Tr. 14–15, 40–41.) In Defendant's left thigh was a bullet hole from where he had just been shot. (Def. Ex. 7 at 10.)

Immediately upon Defendant's arrival into the stabilization room, various nurses, EMS, and medical staff surrounded Defendant's hospital bed in masks and gloves while another of the medical staff stood already donned in a surgical gown. (Gov't Ex. 1 at 04:12:46–54.) As a nurse placed blankets on Defendant's bed because Defendant was feeling cold, the rest of the staff immediately tried to persuade Defendant to take his shirt

---

[1]    The H-SEU works in partnership with Hennepin County Medical Center security to provide a safe and secure environment for patients, visitors, and staff. (Tr. 32.)

and shoes off so they could begin treating him. Defendant refused to take his shirt or

shoes off. Medical staff pleaded with Defendant to let them take his clothes off. They

explained that they needed to see what other injuries he might have and that the bullet

could have damaged his arteries. (Gov't Ex. 1 at 04:12:48–04:14:40; Def. Ex. 4 at

04:13:00–05.) Defendant began to moan in pain, saying, "oh god, oh my god." (Def.

Ex. 4 at 04:13:40–49.) Medical staff remained by Defendant, repeatedly telling him they

needed him to take his clothes off to see if there were more exit wounds. (Gov't Ex. 1 at

04:12:50; Def. Ex. 4 at 04:14:26–45) Without taking off his clothes, they explained,

injuries could be missed. One nurse explained that the bullet could have traveled through

the body and up to his neck where he could possibly be at risk of being paralyzed. (Gov't

Ex. 1 at 04:14:40–50.) She said, "Please let them examine you. Please. I beg you . . .

Please let them help you." (Def. Ex. 4 at 04:14:58–04:15:20.) As medical staff continued

to ask Defendant to take his shirt and shoes off, another medical staff member rolled in a

portable imaging machine to prepare for scanning. (Gov't Ex. 1 at 04:15:40–50.) A

doctor, already wearing surgical gloves, bent down to eye-level with Defendant and told

him that "for all we know, you're bleeding inside right now . . . and we won't be able to

tell if we don't get your jacket off." (Gov't Ex. 1 at 4:15:20–30.) The doctor told

Defendant that "[i]t's got to be fast . . . [y]ou're getting closer to dying, so we got to do

this now." (Gov't Ex. 1 at 04:17:54–04:18:12.) Behind him, a nurse prepared syringes.

(Gov't Ex. 2 at 04:17:50–55.)

     At one point, an HCMC protection officer (hospital security employed by HCMC)

placed a hand on Defendant's chest and began to push him back onto the bed. (Gov't

Ex. 2 at 04:18:15–20.) Defendant kicked back and yelled. (Gov't Ex. 2 at 04:18:20–30.)
Some medical staff backed out of the way as two additional HCMC protection officers
approached the bed and, with the help of the third HCMC protection officer who had put
his hand on Defendant's chest, held Defendant down. (Tr. 45; Gov't Ex. 2 at 04:18:20–
30.) Defendant yelled, "I don't want to! Ah! No! No! . . . I don't want to! No! No! Y'all
can't make me do nothing." (Gov't Ex. 2 at 04:18:11–41.) As he yelled, the nurse who
had been drawing syringes injected Defendant in his right leg with two shots. (Tr. 45–46;
Def. Ex. 7 at 171; Gov't Ex. 2 at 04:18:28–50.) During this time, an HCMC protection
officer told Defendant that medical staff "are trying to help you." (Gov't Ex. 1 at
04:18:26.) The doctor standing nearby also told Defendant, "we are going to help you,
bud . . . we're going to help you, I promise." (Gov't Ex. 1 at 04:19:08–15.)

    The HCMC protection officers continued to hold Defendant as medical staff began
to administer treatment. As they did, one of the HCMC protection officers pressing
against Defendant's jacket using his elbow and right forearm suddenly looked up and
called for Deputy Dziekan, who was now standing at Defendant's bedside. Deputy
Dziekan asked, "What do you need?" (Gov't Ex. 1 at 04:19:35–42.) The HCMC
protection officer responded, "Dziekan, come around." (Gov't Ex. 1 at 04:19:40–43.)
Deputy Dziekan walked around to the head of the hospital bed closer to the HCMC
protection officer. (Gov't Ex. 1 at 04:19:45.) The HCMC protection officer then waved to
draw Deputy Dziekan closer. Deputy Dziekan leaned in closer. The HCMC protection

officer, in a low voice, told Deputy Dziekan that Defendant was "strapped."[2] (Gov't Ex. 1 at 04:19:52–59.) Deputy Dziekan understood this to mean Defendant had a gun. (Tr. 18– 19, 26, 44, 49.) Deputy Dziekan immediately ran to the side of the bed. (Gov't Ex. 1 at 04:20:00–03.) He yelled for people to back up. Deputy Dziekan yelled again, "Where's the gun, dude?" as he began to search the right side of Defendant's body and jacket. (Tr. 22, 26; Gov't Ex. 1 at 04:20:04–08.) Medical staff hurried out of the room at the news that Defendant had a gun. (Gov't Ex. 2 at 04:20:01–20.) Within seconds, Deputy Dziekan found a loaded .38 revolver in Defendant's jacket pocket. (Tr. 22.; Gov't Ex. 1 at 04:20:19–30.) He then continued to search Defendant's pockets as his partner, Deputy Jacob, searched Defendant's left side pockets. (Tr. 49.) During the search, Deputy Dziekan uncovered additional items, including the following: ammunition within the gun; mobile telephones and accessories; a knife; suspected crack cocaine (approximately .4 grams without packaging); and two blue tablets.[3] (Def.'s Mem. 2–3, n.2.)

 As he later testified, throughout this event, Deputy Dziekan had assumed Defendant was a gunshot victim; it was not until the HCMC protection officer informed

---

[2] Later, the HCMC protection officer told Deputy Dziekan that he had felt the gun while pressing down on Defendant. (Gov't Ex. 1 at 04:24:10.)

[3] These items constitute part of a list of additional physical evidence aside from the gun that Defendant wishes to suppress. Those items included the following: (1) clothing, including but not limited to a tan "Carhardtt" (sic) jacket, socks, hat, pants, towel, tennis shoes, and underwear; (2) ammunition, including but not limited to, four live .38 caliber cartridges and one .38 caliber casing; (3) mobile telephones and accessories, including but not limited to an Alcatel cellphone in a red case, two cellphone chargers, a damaged black Motorola cellphone, and a damaged black UMX cellphone; (4) a wallet containing miscellaneous cards; (5) a knife; (6) two house/apartment keys on a red lanyard; (7) suspected crack cocaine (approximately .4 grams without packaging); and (8) two

him that Defendant was "strapped" that he decided to search Defendant. (Tr. 55–56.)

### B.    Defendant's Statements

As Deputy Dziekan and his partner further searched Defendant's pockets, Defendant yelled out various statements, including that he did not want to go back to prison. (Gov't Ex. 1 at 04:19:56–04:23:10.) At one point, an HCMC protection officer asked Defendant if there was anything else on him, to which Defendant responded, "No, that's it . . . I don't have nothing else." (Gov't Ex. 1 at 04:20:47–04:21:10.) Defendant also stated that he was not committing crimes and that the gun was just for his safety and that he was just trying to protect himself. (Gov't Ex. 1 at 04:23:10–35.) Meanwhile, Minneapolis Police standing behind Deputy Dziekan, including Minneapolis Police Department Officer Cain, began examining and taking photos of the gun as medical staff started to prepare Defendant for treatment. (Gov't Ex. 2 at 04:20:35–04:21:45.)

A few minutes after Deputy Dziekan had finished his search, Officer Cain began to question Defendant regarding the shooting incident. (Gov't Ex. 2 at 04:26:09–04:28:41.) By that time, Defendant was strapped to the bed and medicated. (*Id.*; Tr. 50–51.) Officer Cain did not give any *Miranda* warning to Defendant. (Gov't Ex. 2 at 04:26:09–04:28:41.) She asked Defendant where he had been shot, what had happened, and who shot him, to which Defendant responded that he had been shot in "south" outside the gas station "Stop-N-Go" by another man. (Gov't Ex. 2 at 4:26:09–4:28:41.)

Later, after learning that there was a hole in Defendant's jacket pocket and one discharged shell from the gun that they retrieved, officers concluded that Defendant had

---

blue tablets, as well as all other "fruits of the poisonous tree." (Def.'s Mem. 2–3, n.2.)

shot himself. (Def. Ex. 6 at 04:50:10–05:00:13.) With this knowledge, Minneapolis

Police Department Detective Richard Walker went to the hospital to interview Defendant.

(Tr. 60.) As Detective Walker later testified, one of the purposes of this interview was to

see if Defendant would admit that he had the gun in his possession so that Detective

Walker would have that evidence to support a felon in possession charge. (Tr. 79–80.)

Detective Walker arrived at the hospital just after 8:00 a.m., approximately three

hours after Defendant had initially entered the stabilization room. (Tr. 74.) A nurse led

Detective Walker to Defendant's hospital room where he had been moved and was still

recovering. (Tr. 60.) There, Detective Walker could see that Defendant "was clearly

hurting" as he lay strapped down to the bed; he noticed that Defendant spoke softly and

shivered. (Tr. 64–65.) Even though Defendant had just been shot, Detective Walker went

ahead and proceeded with the interview. At the time, Defendant was under the effect of

three different sedative and cognitive impairing drugs.[4] (Def. Ex. 7 at 171.)

Detective Walker gave Defendant a *Miranda* warning, to which Defendant

responded in a low audible and nodded. (Tr. 64.) Detective Walker then began to ask

Defendant questions. The interview lasted approximately ten minutes. (Gov't Ex. 3.)

---

[4]    As Defendant cites in his post-hearing memorandum and as summarized in the
Prescriber's Digital Reference, these drugs—OLANZapine (ZyPREXA), droperidol
(INAPSINE), HYDROmorphone PF (DILAUDID)—have various sedative and cognitive
impairing effects. *See* Prescriber's Digital Reference, *olanzapine – Drug Summary,
available at* https://www.pdr.net/drug-summary/Zyprexa-olanzapine-2269.3985 (last
visited Sept. 29, 2021); Prescriber's Digital Reference, *droperidol – Drug Summary,
available at* https://www.pdr.net/drug-summary/Droperidol-droperidol-1412 (last visited
Sept. 29, 2021); Prescriber's Digital Reference, *dilaudid – Drug Summary, available at*
https://www.pdr.net/drug-summary/Dilaudid-Injection-and-HP-Injection-
hydromorphone-hydrochloride-490.901 (last visited Sept. 29, 2021).

Defendant's answers were mostly grunts and mumbles. (Gov't Ex. 3.) Defendant

answered some of Detective Walker's questions, but within a few minutes into the

interview, Defendant stopped answering and started shivering. (Gov't Ex. 3.) Detective

Walker briefly went to find a nurse to alert her that Defendant was shaking and the nurse

went to grab more blankets. (Gov't Ex. 3.) Detective Walker then asked if Defendant

wanted to talk; Defendant said, in a low voice, "I'm tired." (Gov't Ex. 3.) After the nurse

had returned with extra blankets, Detective Walker proceeded to ask Defendant more

questions and Defendant answered Detective Walker's questions for a few more minutes.

(Gov't Ex. 3.) During this time, Defendant made several statements, including that he had

the gun on him for protection. (Gov't Ex. 3.) Defendant was later indicted on one count

of being a felon in possession of a firearm. (Doc. No. 1.)

## II.    ANALYSIS

Defendant argues that the gun, along with the other physical evidence discovered

during the search of his person, should be suppressed because their seizure resulted from

the unlawful warrantless search and seizure of his person when the HCMC protection

officers held him down against his will.[5] (Def.'s Mem. 25–37.) In addition, Defendant

argues that his statements "following his illegal seizure" should be suppressed, including

the statements to Officer Cain and Detective Walker, because he did not receive a

*Miranda* warning or because they were not "freely given." (*Id.* at 37–44.)

---

[5]    Defendant maintains that, "at the time the officers seized him, they lacked
probable cause, exigent circumstances, valid consent, and reasonable suspicion that he

### A.    Motion to Suppress Evidence Obtained as a Result of Search and Seizure

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This includes the right to be free from unreasonable seizures of one's person such as where a person is restrained from movement by the "laying on of hands or application of physical force." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). "However, as the Supreme Court has long held, this protection extends only to actions undertaken by government officials or those acting at their direction." *United States v. Highbull*, 894 F.3d 988, 991 (8th Cir. 2018). Those government actions include any seizures of a person "done for noninvestigatory purposes," including caretaking functions, so long as those seizures are deemed unreasonable. *Graham v. Barnette*, 5 F.4th 872, 885 (8th Cir. 2021); U.S. Const. amend. IV. A seizure of a person becomes unreasonable when "the nature and quality of the intrusion" via the seizure outweighs the "the importance of the governmental interests alleged to justify the intrusion." *County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quotations omitted). Even if a seizure is deemed unreasonable, evidence obtained as a direct result of that seizure is only subject to exclusion where "exclusion can meaningfully deter it" and the conduct to be deterred is "sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Horton*, 863 F.3d 1041, 1051 (8th Cir. 2017) (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)).

---

was engaged in criminal activity." (Def.'s Mem. 3.)

1.      **The HCMC protection officers are government actors[6]**

The Fourth Amendment applies to any "governmental action" of "civil as well as criminal authorities" and is not limited solely to police. *New Jersey v. T.L.O*., 469 U.S. 325, 335 (1985). This includes staff employed by a state hospital. *See Ferguson v. City of Charleston*, 532 U.S. 67, 76 (2001) ("Because MUSC is a state hospital, the members of its staff are government actors, subject to the strictures of the Fourth Amendment.").

Here, the HCMC protection officers worked for HCMC. HCMC is a hospital doing business as "Hennepin Healthcare System," a public corporation that operates as a subsidiary of Hennepin County. *See* Minn. Stat. § 383B.901 ("There is created a corporation which shall be public in nature, operating as a subsidiary of the county of Hennepin. The public corporation shall be known as Hennepin Healthcare System, Inc."); *see also Doe v. Tsai*, No. 08-cv-1198 (DWF/AJB), 2010 WL 2605970, at *1 n.1 (D. Minn. 2010) ("HCMC is doing business as Hennepin Healthcare System."). Numerous cases in the Eighth Circuit have recognized employees of HCMC as government actors. *See, e.g.*, *Buckley v. Hennepin Cty.*, 9 F.4th 757, 761 (8th Cir. 2021); *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 879 (8th Cir. 2019). This Court recognizes the same. Because HCMC is a public hospital and its employees are government employees, and because the HCMC protection officers are HCMC employees, the HCMC protection officers are government actors and not private actors.[7]

---

[6]      The Government neither disputes nor acknowledges in their post-hearing briefing that the HCMC protection officers are government employees.

[7]      Because this Court finds that HCMC protection officers are government actors,

2.    **The HCMC protection officers were acting with an "administrative purpose"**

For the conduct of a governmental party to be subject to the Fourth Amendment, "the governmental party engaging in that conduct must have acted with the intent to assist the government in its investigatory or *administrative purposes* and not for an independent purpose." *United States v. Inman*, 558 F.3d 742, 745 (8th Cir. 2009) (citing *United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990)) (emphasis added).

The Government contends that the HCMC protection officers were not acting with an intent to assist the government in an investigatory or administrative purpose but for the independent purpose of administering healthcare. (Govt's Resp. 13.) However, the Eighth Circuit recently decided in *Buckley v. Hennepin County* that HCMC paramedics effectuate a Fourth Amendment seizure when they place a patient on a medical transport hold and secure that patient to an ambulance gurney. *See Buckley*, 9 F.4th at 761 ("Buckley concedes she was properly placed on a medical transport hold and secured on the ambulance gurney [by the HCMC paramedics], *actions that effectuated a Fourth Amendment seizure*.") (emphasis added). Here, the HCMC protection officers acted by restraining Defendant to assist medical personnel in administering treatment and to protect medical personnel. This was not the type of "independent purpose" contemplated by *Inman* but instead an administrative purpose like the actions performed by the HCMC

this Court need not address Defendant's additional argument that because the HCMC protection officers engaged in a joint operation with H-SEU deputies, the HCMC protection officers were government actors. (Def.'s Mem. 33.)

CASE 0:21-cr-00115-SRN-BRT    Doc. 49    Filed 10/01/21    Page 13 of 31

paramedics in *Buckley*.[8] Therefore, this Court concludes that because the HCMC

protection officers were working with an administrative purpose when they held

Defendant down to assist medical personnel in administering treatment and to protect

medical personnel, their actions are subject to the Fourth Amendment.

### 3. The seizure of Defendant by the HCMC protection officers was objectively reasonable

As applied to a person, "the word 'seizure' readily bears the meaning of a laying

on of hands or application of physical force to restrain movement, even when it is

ultimately unsuccessful." *Torres*, 141 S. Ct. at 995 (citing *California v. Hodari D.*, 499

U.S. 621, 626 (1991)). However, not all seizures are prohibited by the Fourth

Amendment: only unreasonable ones. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968) ("[W]hat

the Constitution forbids is not all searches and seizures, but unreasonable searches and

seizures.") (citing *Elkins v. United States*, 364 U.S. 206, 222 (1960)); *see also Schmerber

v. California*, 384 U.S. 757, 768 (1966) ("[T]he Fourth Amendment's proper function is

to constrain, not against all intrusions as such, but against intrusions which are not

justified in the circumstances, or which are made in an improper manner."). Whether a

seizure is reasonable is "generally assessed by carefully weighing the nature and quality

---

[8]     In *Inman*, the defendant, a municipally employed paramedic, brought a Fourth Amendment motion to suppress in connection with his supervisor accessing his computer and opening and observing files containing child pornography, which the supervisor subsequently reported to law enforcement. 558 F.3d at 745. The Eighth Circuit affirmed the district court's denial of the defendant's motion to suppress, concluding that the supervisor's actions did not implicate the Fourth Amendment because he had not accessed the defendant's computer with "the intent to assist the government in its investigatory or administrative purposes," but rather to satisfy his own curiosity about the defendant's new girlfriend. *Id.* at 745–46.

of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Mendez*, 137 S. Ct. at 1546 (quotations omitted); *see also Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017). "The greater the intrusion on a citizen, the greater the justification required for that intrusion to be reasonable." *Graham*, 5 F.4th at 885.[9]

Here, the record shows that the three HCMC protection officers seized Defendant—a victim of a gunshot wound—when they restrained him to the hospital bed and intruded on Defendant's liberty interest. This intrusion, however, lasted less than two minutes before an HCMC protection officer discovered a gun in Defendant's jacket pocket.[10] During the initial seizure, Defendant was not handcuffed or strapped down; the

---

[9]     Defendant cites *Graham* for support that probable cause is the standard the Government must meet. (Def.'s Mem. 31.) But *Graham*'s probable cause ruling relates to the standard for arrests of an individual for a mental-health evaluation – a scenario different from the situation before this Court (for the same reason, Defendant's citations to Minnesota Statute § 253B.051 are also not relevant here). *See* 5 F.4th at 886. Moreover, *Graham*'s ruling is couched in the court's observations regarding the sanctity of the home, which is not involved here. *Id.* ("Our confidence that the Fourth Amendment demands probable cause of dangerousness to effectuate a mental-health arrest in this case is reinforced by the location of this arrest: Graham's home.").

[10]    This Court concludes that, once Deputy Dziekan had knowledge of the gun, he had reasonable suspicion to conduct a search of Defendant because the totality of the circumstances, including Defendant's evasiveness, created a "particularized and objective basis for suspecting wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted); *see also Terry*, 392 U.S. at 30–31. In addition, once Deputy Dziekan knew Defendant had a gun, exigent circumstances existed to protect medical staff, himself, other officers, and Defendant from harm. *See United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995)  ("Exigent circumstances exist, however, when law enforcement officials have a legitimate concern for the safety of themselves or others.") (quotations omitted).

HCMC protection officers used their hands and bodies to keep Defendant momentarily still to allow for medical staff to begin treatment. When an HCMC protection officer put his hand on Defendant's chest to try to get him to lay flat, Defendant became agitated and kicked near where medical personnel stood. One of the HCMC protection officers asked Defendant to "stop fighting" and told him the medical staff "are trying to help you." (Gov't Ex. 1 at 04:18:22–04:19:40.) Another HCMC protection officer told Defendant to "hold my hand." (Gov't Ex. 1 at 04:18:22–04:19:40.) The doctor at the scene told Defendant he was going to help him. (Gov't Ex. 1 at 04:19:09–13.) During this initial seizure, it was not known the extent of Defendant's injuries; it was believed there may be an unknown exit wound, that Defendant may be bleeding internally, and that Defendant's injuries may be life-threatening. The HCMC protection officers' interest at that time was to assist and protect medical personnel as they administered potentially life-saving treatment to Defendant.

In weighing Defendant's Fourth Amendment interest against the Government's interest, the Eighth Circuit's decision in *Buckley v. Hennepin County* is particularly instructive.[11] In *Buckley*, the Eighth Circuit held that it was not objectively unreasonable

---

[11]    Defendant argues *Buckley* does not apply here because it did not involve "a Fourth Amendment claim of unlawful seizure for purposes of unwanted medical treatment, but rather concerned excessive force claims, substantive due process claims, bodily integrity claims, and deliberate indifference claims, all relating to HCMC's injection of the plaintiff with ketamine without the plaintiff's consent." (Doc No. 46, Def. Reply Mem. 12–13.) But these distinctions do not subtract from the relevant import of *Buckley*, which, as here, considered a government seizure of a person by HCMC personnel and determined whether it was objectively unreasonable under the Fourth Amendment to administer medical aid to someone who needed medical intervention. *Buckley*, 9 F.4th at 761–62.

for HCMC paramedics to administer medical aid to a woman who required medical intervention. 9 F.4th at 762. There, HCMC paramedics, as part of a requested welfare check, encountered a woman in her apartment who had been drinking for two days and had threatened self-harm. *Id.* at 759. The woman objected multiple times to going to the hospital and refused to leave. *Id.* Officers and paramedics then "handcuffed her and carried her to the ambulance, where she was placed on a gurney and secured by cuffing each arm to a rail, with a shoulder harness, and hip, thigh, and ankle straps." *Id.* The paramedics, fearing she would injure herself by fighting the restraints or themselves, decided to inject her with the sedative ketamine "without her consent while she was fully restrained." *Id.* at 761–62. The woman brought suit against the paramedics under § 1983 for injecting her without her consent, arguing that the paramedics had violated her Fourth Amendment right to be free from excessive force. *Id.* at 760–63. The *Buckley* court concluded, after applying the objective reasonable standard, that "[i]t was not objectively unreasonable for paramedics to administer medical aid to an intoxicated, suicidal, semi-conscious woman who needed medical intervention." *Id.* at 762.

The Eighth Circuit has also held that exigent circumstances justify the seizure of a person's body when a medical emergency exists. *United States v. Nelson*, 36 F.3d 758, 761 (8th Cir. 1994). In *Nelson*, police, under the supposed sufficient authority of a warrant, attempted to extract a packet of heroin that the defendant had swallowed and which had become subsequently lodged in his stomach. *Id.* at 759. Against the defendant's wishes, officers ordered doctors to perform either an endoscopy or surgery to retrieve the heroin. *Id.* at 759–60. Later, the warrant upon which the officers had relied

upon for authority to order the procedure was discovered to be insufficient. *Id.* On appeal, the government argued that, even if the warrant was insufficient, exigent circumstances still justified the endoscopy because the lodging of the heroin packet in the defendant's stomach created a medical emergency. *Id.* at 761. The Eighth Circuit recognized that "[e]xigent circumstances exist where the delay necessary to obtain a warrant . . . threatens the defendant's life." *Id.* But it concluded that the police lacked the necessary exigent circumstances here to justify the warrantless intrusion because no medical emergency existed. *Id.* In particular, the Eighth Circuit noted that though the doctors were concerned that the packet of heroin which the defendant had swallowed could possibly rupture inside him, "there was no immediate threat nor any emergency medical procedures conducted to remove the packet." *Id.* Thus, the *Nelson* court concluded the officers lacked exigent circumstances to intrude upon the defendant's body to retrieve the packet via an endoscopy. *Id.*

Here, the "nature and quality of the intrusion" on Defendant's individual Fourth Amendment interest weighs relatively low because the seizure lasted less than two minutes and involved only a brief physical hold on a hospital bed. *Mendez*, 137 S. Ct. at 1546 (quotations omitted); *cf. Wright v. United States*, 813 F.3d 689, 699 (8th Cir. 2015) ("The twenty-minute detention was not an unreasonable seizure under the Fourth Amendment."). The HCMC protection officers used the least intrusive means possible that they could under the circumstances. *See United States v. Oyekan*, 786 F.2d 832, 838 (8th Cir. 1986) (concluding there was no Fourth Amendment violation in part because the search via x-rays was "performed in this case by the least intrusive means possible").

And the HCMC protection officers' seizure was limited to medical aid, not for furthering searches. *Cf. United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976) (concluding that the Fourth Amendment intrusion to motorists with a routine checkpoint is limited in part because, though the vehicle is physically detained, "[n]either the vehicle nor its occupants are searched.").

The importance of the Government's interests, on the other hand, weighs exceedingly high. *See Mendez*, 137 S. Ct. at 1546. The Government's interests justifying the intrusion included allowing medical personnel to provide potentially life-saving medical aid to Defendant.[12] As stated above, the medical personnel in the room feared Defendant had a life-threatening wound, making the situation far more urgent than in *Buckley* where the Eighth Circuit concluded the HCMC paramedics' action of injecting ketamine into the restrained plaintiff was objectively reasonable even though the plaintiff was not suffering any life-threatening injury and was already restrained to a gurney by arm cuffs, a shoulder harness, and hip, thigh, and ankle straps. Moreover, unlike in *Nelson*, the HCMC protection officers were justified by exigent circumstances that existed "where the delay necessary to obtain a warrant . . . threaten[ed] the defendant's life" such that the medical staff agreed there was an immediate medical threat that

---

[12]    This Court notes that had the HCMC protection officers not restrained Defendant, Defendant may have never received treatment and HCMC could have faced liability for ignoring Defendant's serious medical needs. *See Buckley*, 9 F.4th at 762 ("Otherwise . . . paramedics would face a kind of Catch-22 . . . treat the arrestee or don't treat him, but face a lawsuit either way.") (citing *Thompson v. Cope*, 900 F.3d 414, 423–24 (7th Cir. 2018) ("If the officers and paramedic had not responded to Heishman's excited delirium, they could easily have found themselves defending against a deliberate indifference claim for ignoring his obvious and serious medical needs.")).

required an emergency medical procedure.[13] *See Nelson*, 36 F.3d at 761. And not only were the HCMC protection officers attempting to hold Defendant still so he could receive medical aid, but they were also trying to protect medical personnel from Defendant's physical movements as well. Protecting staff and keeping a secure hospital are valid interests that weigh in favor of finding the seizure reasonable.

Therefore, based on the circumstances presented here, the Government's interests

---

[13]     Defendant argues that, because Defendant voluntarily and competently refused treatment, any seizure of his person for the administration of unwanted medical aid was per se unreasonable. He cites *Green v. City of New York*, a Second Circuit case, for the principle that if a person can voluntarily and competently refuse unwanted medical treatment then, even if they are in extremis, a seizure upon that person for medical treatment is objectively unreasonable. 465 F.3d 65 (2nd Cir. 2006).

But *Green* originates from the Second Circuit; thus, it is not binding on this Court. In addition, *Green* conflicts with the Eighth Circuit's decision in *United States v. Nelson*. In *Nelson*, the Eighth Circuit held that, under the Fourth Amendment, the government can justify an intrusion of a defendant's body where a medical emergency exists, even when the defendant refuses the procedure. 36 F.3d at 761; *see also Buckley*, 9 F.4th at 763 (observing under Plaintiff's due process claim that, "[e]ven if the semi-conscious [plaintiff] was competent to refuse treatment," the paramedics did not violate her due process rights to be free from unwanted medical treatment when they injected her with ketamine to protect her and themselves).

*Green* is also distinguishable on its facts. Unlike the plaintiff in *Green* who was still in a stable condition when the officers and paramedics removed him from his home after his mechanical respirator had malfunctioned, Defendant was suffering from a gunshot wound that doctors were concerned might be leading to his death. Defendant also did not have family, assistants, attorneys, or any trained medical personnel coming to his aid like the plaintiff did in *Green*. In addition, Defendant arrived at the hospital on his own free will and was not forcibly removed from his home. And video from the bodycam footage shows that Defendant was more concerned about removing his jacket and shoes then he was about receiving treatment, unlike the plaintiff in *Green* who repeatedly refused treatment and whose family erected a barricade of furniture to prevent first responders from removing the plaintiff. Thus, the facts here show a far graver circumstance than presented in *Green*. For these reasons, *Green* is distinguishable.

(both medical and security), when weighed against the limited and brief seizure of
Defendant, weigh in favor of finding the seizure objectively reasonable. This Court thus
finds no Fourth Amendment violation and Defendant's motion should be denied.

### 4. Even if the seizure of Defendant by the HCMC protection officers was objectively unreasonable, the exclusionary rule does not apply

"A violation of the Fourth Amendment usually triggers exclusion of evidence
obtained by way of the violation from a subsequent criminal prosecution." *United States
v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014) (quotations omitted). But "suppression is not
an automatic consequence of a Fourth Amendment violation." *United States v. Houck*,
888 F.3d 957, 959 (8th Cir. 2018); *see also Hudson v. Michigan*, 547 U.S. 586, 591
(2006) ("Suppression of evidence, however, has always been our last resort, not our first
impulse."). Courts must look at the "efficacy of the [exclusionary] rule in deterring
Fourth Amendment violations in the future." *Herring*, 555 U.S. at 141. For example,
excluding evidence deters law enforcement from unreasonable searches and seizures by
negatively hindering the success of their police work. *See Stone v. Powell*, 428 U.S. 465,
492 (1976) ("Evidence obtained by police officers in violation of the Fourth Amendment
is excluded at trial in the hope that the frequency of future violations will decrease.").

Here, the only deterrence that suppressing the seized evidence would have would
be to deter the HCMC protection officers from assisting medical personnel in attempting
to save patients' lives and to deter the HCMC protection officers from protecting HCMC
staff from physical harm. This is not the deterrence that the exclusionary rule's purposes
were meant to accomplish. *See Herring*, 555 U.S. at 144 ("[T]he exclusionary rule serves

to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."). Defendant's argument that suppression would have an indirect deterrent effect on H-SEU is unavailing because the H-SEU's goal, like the HCMC protection officers' goal, is to create a safe and secure environment for HCMC patients, visitors, and staff – not to primarily investigate or prosecute crime. (*See* Def.'s Reply Mem. 21; Def.'s Mem. 9; Tr. 32, 52.)

In addition, the HCMC protection officers could not have had knowledge, or should not have had knowledge, that doing their job to assist medical personnel in saving a patient's life was unconstitutional under the Fourth Amendment. *See Herring*, 555 U.S. at 143 ("[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.") (quotations omitted).

Thus, because this Court finds the suppression of Defendant's physical evidence would not provide a deterrent that the exclusionary rule was meant for, this Court concludes that, even if the seizure were objectively unreasonable, suppressing the physical evidence would be unwarranted here.[14]

---

[14]    The Government argues in its responsive briefing that, in addition to the fact that suppression is not warranted here, under the inevitable discovery doctrine, even if the HCMC protection officers had not restrained Defendant, law enforcement would have inevitably discovered the gun anyway because (a) officers would not have allowed Defendant to leave the hospital given the seriousness of his injury, (b) Deputy Dziekan had testified that he believed Defendant may have had a gun under the circumstances and thus would not have let Defendant leave the hospital, and (c) law enforcement officers were actively investigating the shooting incident. (Govt's Resp. 18–19.) But because the facts and testimony demonstrate that Defendant was not suspected of any illegal activity before the gun was found and because the Government does not explain how barring

**B.    Motion to Suppress Statements, Admissions, and Answers**

**1.    Statements made immediately after Defendant's seizure**

Defendant argues that the statements he made "after his . . . warrantless seizure" but before Officer Cain questioned him should be suppressed because he did not receive a *Miranda* warning in violation of the Fifth Amendment. (Def.'s Mem. 2, n.1.) The Government argues these statements are voluntary and not in response to an interrogation and thus not prohibited by the Fifth Amendment. (Govt's Resp. 20.)

A "voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999) (quotations omitted). To prove that a statement is involuntary, "[c]oercive government activity is necessary." *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995).

Here, after the HCMC protection officer alerted Deputy Dziekan that Defendant was "strapped," Deputy Dziekan ran to the side of the bed and asked "Where, where, back up, where? Where's the gun, dude?" (Gov't Ex. 1 at 04:20:00–07.) In response, the HCMC protection officer who had alerted Deputy Dziekan patted a section of Defendant's jacket where he had felt the gun. (*Id.*) The following dialogue then ensued as Deputy Dziekan discovered the gun and slipped it out of Defendant's jacket pocket:

> DEFENDANT: Why is he holding me like that? I feel comfortable with telling you that. I feel comfortable with telling him that.

Defendant from leaving the hospital would have inevitably led to the discovery of the gun, this Court does not perceive a "reasonable probability" that the gun would have been discovered by lawful means. *United States v. James*, 353 F.3d 606, 616–17 (8th Cir. 2003).

HCMC PROTECTION OFFICER: What's that? What's that? Pull it out.

DEFENDANT: I feel comfortable with telling him that.

SECOND HCMC PROTECTION OFFICER: Chill, bro.

DEFENDANT: I feel comfortable with telling him that.

HCMC PROTECTION OFFICER: I know, I know, I know, but we have to take this.

DEFENDANT: You take it, I don't care.

HCMC PROTECTION OFFICER: Yes, I know. Relax.

DEFENDANT: I don't care, but, I feel comfortable with telling him . . . I just don't want to go back to prison, bro.

. . . .

HCMC PROTECTION OFFICER: I appreciate that you're comfortable. Is there anything else on you, bro?

DEFENDANT: I should be talking to you—

HCMC PROTECTION OFFICER: Is there anything else?

DEFENDANT: No, that's it . . .that's it, I don't have nothing else . . . .

(Gov't Ex. 1 at 04:20:00–04:21:10.)

Defendant then blurted out various statements, not in response to any question, as Deputy Dziekan and his partner Deputy Jacob finished their search of Defendant's pockets and medical staff stripped the rest of Defendant's clothes off and began to prepare him for treatment. These statements include the following:

- "I'm not trying to go back to prison. . . . I'm not trying to go back to prison";

- "Please, I'm not out here committing no type of crimes. I'm just trying to protect myself . . . I'm just trying to protect myself, that's it . . . . I don't commit crimes. I don't . . . hurt people";

- "It was just for my safety, that's it";

- "But I'm not trying to go back to prison."

(Gov't Ex. 1 at 04:21:10–04:23:45.)[15]

As to the first set of statements highlighted above,[16] this Court finds that, because Defendant had a concealed, loaded gun on him and potentially other weapons that posed a threat to public safety,[17] Deputy Dziekan's questions regarding where the gun was and the HCMC protection officer's question regarding whether Defendant had "anything else" on him fall within the public safety exception to the *Miranda* rule, which allows the admission of answers to an officer's questions when "the need for answers to questions in a situation posing a threat to the public safety" outweigh "the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *See New York v. Quarles*, 467 U.S. 649, 657 (1984) ("Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to

---

[15] As Defendant made these statements, a medical staff member told Defendant that they were currently worried about his health. Deputy Dziekan told Defendant, "They're here for your medical care, right now, dude. Let's focus on one thing at a time." (Gov't Ex. 1 at 04:22:00.) And the doctor told Defendant, "Hold on man, let's get your coat off and stuff and get you taken care of, all right? Let's worry about you first." (Gov't Ex. 1 at 04:22:45–53.)

[16] (Gov't Ex. 1 at 04:20:00–04:21:10.)

[17] A second weapon (a knife) was also found on Defendant's person during the subsequent search.

the public did not result from the concealment of the gun in a public area.").

As to the second set of statements,[18] because Defendant made these statements unprompted, and not in response to any questions, this Court finds they were not made in response to an interrogation. *See United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1039 (8th Cir. 2010) (finding the defendant's "spontaneous statements to [police] were voluntary and not in response to interrogation, and should not be suppressed"); *see also United States v. McGlothen*, 556 F.3d 698, 701–02 (8th Cir. 2009) (finding spontaneous a defendant's statement that he owned a specific firearm and that he had bought it for his own protection after the officers had informed Defendant why they were there, told him he was under arrest, and presented him with the gun the officers found in his residence). Additionally, because this Court does not perceive any evidence of coercive activity such that Defendant made these statements against his will, this Court finds Defendant's statements here to be voluntary as well.

Therefore, because Deputy Dziekan's question ("Where, where, back up, where. Where's the gun, dude?") and the HCMC protection officer's question ("Is there anything else?") fall within the public safety exception to the *Miranda* rule, this Court finds Defendant's statements made in response to those questions should not be suppressed. In addition, because Defendant's statements made moments later were not in response to any question and were voluntary, this Court finds those statements should not be suppressed either.

---

[18]    (Gov't Ex. 1 at 04:21:10–04:23:45.)

2.    **Statements made in response to Officer Cain**

Approximately three minutes after Defendant finished making his unprompted statements, Officer Cain walked over to his bedside and began to question Defendant while medical personnel administered treatment. Defendant argues that because Officer Cain did not provide him with any *Miranda* warning prior to this questioning, his statements in response should be suppressed. (Def.'s Mem. 39.) The Government argues the statements should not be suppressed because they fall within the public safety exception. (Govt's Resp. 20.)

The public safety exception "permits a suspect's answer to a question to be admitted into evidence even if he had not first been informed of his *Miranda* rights so long as the purpose of the officer's question was to ensure public safety, not merely to elicit evidence." *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016). The exception is based on an objective standard and applies when "police officers ask questions reasonably prompted by a concern for the public safety." *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008) (quotations omitted).

When Officer Cain spoke with Defendant, Defendant had been injected with medication and was strapped to the bed. Without giving any *Miranda* warning, she began to interview Defendant regarding the incident:

> OFFICER CAIN: Hey bud, where did this happen at . . . do you remember where?
>
> DEFENDANT: . . . It happened over south.
>
> OFFICER CAIN: Over south. Do you know where?

DEFENDANT: It happened by a gas station.

OFFICER CAIN: What gas station?

DEFENDANT: . . . Stop-N-Go. . .

OFFICER CAIN: . . . Do you know who did this?

DEFENDANT: . . . I was outside and two dudes, they was playing with me. And the next thing I know I turned around, and I heard a pop. Dude dropped the gun and he ran.

(Gov't Ex. 2 at 4:26:10–4:28:43.) Officer Cain then continued to interview Defendant for another minute regarding the men who shot Defendant and then ended the interview by obtaining Defendant's phone number.[19] (*Id.*)

This Court finds that because the shooting had just occurred and a shooter was believed to be at large, the questions asked by Officer Cain considering the ongoing shooter risk demonstrate that the purpose of her questions was to ensure public safety, not merely to elicit evidence. *See, e.g.*, *Quarles*, 467 U.S. at 651 ("[O]verriding considerations of public safety justify the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon."). Therefore, this Court finds Defendant's answers to those questions should not be suppressed.

### 3.    Statements made in response to Detective Walker

Defendant argues that his waiver of Detective Walker's *Miranda* warning in his

---

[19]    Defendant's statement regarding his phone number should not be suppressed because it is well-settled that routine biographical data is exempted from *Miranda*'s mandate. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *United States v. Horton*, 873 F.2d 180, 181 n. 2 (8th Cir. 1989).

hospital room was involuntary, unknowing, and unintelligent in violation of his Fifth Amendment rights. (Def.'s Mem. at 39.) The Government argues that Defendant's waiver was knowing and voluntary. (Govt's Resp. at 21.)

A valid *Miranda* waiver has two distinct dimensions: (1) it "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception" and (2) the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The totality of the circumstances must demonstrate a "requisite level of comprehension" of the rights being waived. *Colorado v. Spring*, 479 U.S. 564, 573 (1987). The Government has the burden of proving, by a preponderance of the evidence, that Defendant made a valid waiver of his *Miranda* rights. *Miranda*, 384 U.S. at 473. To conclude that Defendant's *Miranda* waiver was knowing and intelligent, the Court must find, based on the totality of the circumstances, that he had full awareness of the rights he was waiving, and the consequences of doing so. *Moran*, 475 U.S. at 421.

Here, approximately three hours after Defendant received treatment and medication for a gunshot wound, Detective Walker visited Defendant in the hospital. He gave Defendant a *Miranda* warning to which Defendant responded in a "low audible" and nodded. (Tr. 64.)[20] Detective Walker then began to notice Defendant was "in agony"

---

[20]    Before Detective Walker arrived, Defendant had received various medications, including OLANZapine (ZyPREXA); droperidol (INAPSINE), and HYDROmorphone

and "a lot of pain." (Tr. 65.) Defendant was "slow to respond" and mumbled. (Tr. 78, 81.) Sometimes he would only respond with a grunt. (Tr. 81.) Though Detective Walker testified that "most of the time in the interview" Defendant was "staring [him] in the eyes," there were times when he believed Defendant might have dozed off and was fading in and out of consciousness. (Tr. 82.) At one point, Defendant's pause in answering Detective Walker's question went so long Detective Walker wasn't sure if he had fallen asleep. (*Id.*)

The facts here are similar to the facts described in *United States v. Booker*, No. CR 13-3 (JRT/FLN), 2013 WL 12074955, at *2 (D. Minn. Mar. 8, 2013), *report and recommendation adopted*, No. 13-003 (JRT/FLN), 2013 WL 12074956 (D. Minn. Mar. 27, 2013). In *Booker*, the defendant was taken to the hospital immediately for injuries and interviewed only six hours later. *Id.* at *3. Within that time frame, the defendant underwent surgery. *Id.* The *Booker* court noted there was no urgent need to conduct the interview while the defendant was in the hospital and that the gun in question had been seized. *Id.* In addition, the audio recording of the police interview showed that it was difficult for the defendant to speak. *Id.* He sounded extremely drowsy. *Id.* His speech was slurred and mumbled. *Id.* The officers had to repeat what they were saying. *Id.* And the defendant had received the drug "Dilaudid." *Id.* The court in *Booker* concluded that, based on these facts, the government had not proven by a preponderance of the evidence

---

PF (DILAUDID). (Def. Ex. 7 at 171.) These medications are known for their sedative effects; specifically, OLANZapine (ZyPREXA) is an antipsychotic that has the potential to impair cognitive skills and HYDROmorphone PF (DILAUDID) can cause mood changes, mental clouding, euphoria, dysphoria and more.

"that the *Miranda* waiver [the defendant] gave at the beginning of the interview was knowing and intelligent. *Id.*

Though not all the facts in *Booker* are perfectly aligned with this case, the majority overlap. Indeed, some are even more egregious here, such as the shorter time lapse between the hospital admittance and the questioning and the drugs given to Defendant.[21] This Court has heard and received the testimony provided at the hearing, and independently reviewed the audio of Defendant's interview. The record reflects that Detective Walker interviewed Defendant less than four hours after he had arrived at the hospital for treatment for a gunshot wound. Defendant was under the influence of several sedative and cognitive impairing drugs, including DILAUDID. The audio recording indicates that it was difficult for Defendant to speak and that he wavered in an out of consciousness. Defendant spoke so softly and mumbled so that it is hard to hear him at times. Detective Walker had to repeat his questions to elicit answers. And at one point, Defendant became so tired it appeared to Detective Walker he had dozed off.

Based on a review of the record, this Court concludes that the Government has not met its burden of showing by a preponderance of the evidence that Defendant's *Miranda* waiver was knowing or intelligent. Instead, a preponderance of the evidence shows that Defendant did not fully understand the *Miranda* rights he waived, or the consequences of doing so. Because the *Miranda* waiver was not valid, the statements provided by

---

[21]     The Government cites *United States v. Miller*, No. CR 19-322 (JRT/TNL), 2020 WL 3567834 (D. Minn. July 1, 2020), for support. (Doc. No. 28, 13–14.) In that case, however, the defendant appeared coherent and the interview occurred a full two days later after the defendant had been in the hospital. *Id.* at *1. The facts in that case are

Defendant when interviewed by Detective Walker should be suppressed, and this portion of Defendant's motion should be granted.

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 22) be **GRANTED IN PART** and **DENIED IN PART**. Defendant's statements in response to Officer Walker's interview should be suppressed.

2.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 23) be **DENIED**.


Date: October 1, 2021                      *s/ Becky R. Thorson*_____
                                                        BECKY R. THORSON
                                                        United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **October 15, 2021**. A party may respond to those objections by **October 29, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.

---

simply different from the situation present in this case.