# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Dywan Lamar Conley,<br><br>　　　　　Defendant. | Crim. No. 21-115 (SRN/BRT)<br><br><br>**ORDER ON DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION** |

Amber M. Brennan and Harry Jacobs, United States Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for Plaintiff.

Keala C. Ede, Office of the Federal Defender, 300 S. 4th St., Ste. 107, Minneapolis, MN 55415, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Objections [Doc. No. 52] to Magistrate Judge Becky R. Thorson's October 1, 2021 Report and Recommendation ("R&R") [Doc. No. 49]. In the R&R, Magistrate Judge Thorson recommended that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Doc. No. 23] be denied and that Defendant's Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") [Doc. No. 22] be granted in part and denied in part.

Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court overrules Defendant's Objections and adopts the R&R in its entirety.

1

## I.    BACKGROUND

### A.    Factual Background

The factual background of this case is more fully set forth in the R&R, which the Court incorporates by reference. (R&R at 1–9.) Defendant Dywan Lamar Conley is charged in a single-count indictment with being a felon in possession of a firearm. (Indictment [Doc. No. 1].) He moves to suppress evidence obtained during the seizure of his person at Hennepin County Medical Center ("HCMC"), where he was receiving medical care. He also moves to suppress statements made during and following the seizure.

On April 15, 2021, an unnamed person dropped off Conley, who had suffered a gunshot wound to the leg, at HCMC. (R&R at 2–3.) Shortly thereafter, the Hospital Sheriff's Enforcement Unit ("H-SEU") dispatched Deputies Dziekan and Jacob to HCMC, where they met medical staff at the ambulance bay. (*Id*. at 3.)

Shortly after Conley's arrival in the hospital's triage room, medical staff discovered a bullet entry wound in his left thigh, with no clear exit wound. (*Id.* at 3–4.) Much of the interaction between Conley, medical staff, law enforcement, and hospital security officers was captured on body cameras worn by the law enforcement officers. (*See* Gov't Exs. 1 & 2; Def. Exs. 4–6.) For several minutes, Conley sat upright on a hospital gurney, examining his exposed gunshot wound. (Gov't Ex. 1 at 04:12:48–04:18:17.) Fearing that Conley might have life-threatening injuries, medical staff asked if they could remove his remaining clothing and shoes in order to examine and treat him. (*Id*.) Conley refused, but inquired about the location of his wallet. (Gov't Ex. 2 at 04:17:32–04:18.07.) A nurse indicated that his wallet, phone, and hat were on a nearby table, and explained that medical

staff would place his clothing and belongings in bags for safekeeping. (*Id.*)   While Conley refused to undress further, hospital staff pleaded for his cooperation, explaining that the removal of his clothing was necessary for several important reasons.   (Gov't Ex. 1 at 04:17:54–04:18:12.)   They noted that Conley might be bleeding internally, "people miss other injuries all the time," and he was "getting closer to dying, so we got to do this now." (Gov't Ex. 1 at 04:17:54–04:18:12; Def. Ex. 4 at 04:14:40.)   After engaging in these non-fruitful discussions for several minutes, a nurse asked whether someone was "ready" and an HCMC protection officer—a security officer employed directly by HCMC—attempted to guide or push Conley, who was still sitting upright, into a supine position on the gurney. (R&R at 4; Gov't Ex. 2 at 04:18:04–04:18:06.)   Conley yelled in protest, appeared to kick his feet, and attempted to get off the gurney.   (R&R at 4–5.)   His actions prompted two additional HCMC protection officers to assist in restraining him. (*Id.* at 5.) As Conley yelled, "Y'all can't make me do nothing," a nurse injected two medications into his right leg.  (Gov't Ex. 2 at 04:18:19–04:18:50; R&R at 5.)

HCMC protection officers continued to restrain Conley, assuring him that medical staff "[were] trying to help [him]."  (Gov't Ex. 1 at 04:18:26.)   In the course of restraining him, one of the protection officers felt a gun on Conley's person and reported his findings to Deputy Dziekan.  (R&R at 5.)   Deputy Dziekan directed medical staff to stand back, and asked Conley where the gun was located before finding a loaded .38 revolver in Conley's jacket pocket.  (*Id.*)   Deputy Dziekan and Deputy Jacob continued to search Conley's clothing for any additional weapons.  (*Id.*)   Deputy Dziekan later testified that he

3

had assumed Conley was a gunshot victim and only decided to search him when the protection officer told Dziekan that Conley was armed.  (*Id.* at 5–6.)

As Deputies Dziekan and Jacob searched Conley's pockets, they found other items, including mobile phones, a knife, and suspected narcotics.  (*Id.* at 6.)  During this time, Conley made several statements, including a statement that he did not want to go back to prison.  (*Id.* at 7.)  In response to an HCMC protection officer's question as to whether Conley had any other weapons on his person, Conley stated that the gun was for his own safety and that he had "nothing else" on him.  (*Id.*)

After the deputies finished their search, Minneapolis Police Officer Maiya Cain questioned Conley about the shooting.  (*Id.* at 7.)  At that time, Conley was strapped to the bed and medicated.  (*Id.*)  Officer Cain did not give Conley a *Miranda* warning.  She asked where Conley had been shot, who had shot him, and what had happened.  (*Id.*)  Conley told her that he had been shot by a man in the "south" part of the city, outside a Stop-N-Go gas station.  (Gov't Ex. 2 at 04:26:09–04:28:41.)

One of the deputies reexamined Conley's jacket, which had been placed in a paper bag, and found a hole in the jacket pocket and a discharged shell, leading officers to believe that Conley had shot himself.  (R&R at 7–8.)

Three hours after Conley had been admitted to the hospital, Minneapolis Police Department Detective Richard Walker interviewed him.  (*Id*. at 8.)  Detective Walker gave Conley a *Miranda* warning, to which Conley nodded and provided a barely audible response.  (*Id.*)  Conley was in and out of consciousness during most of the ten-minute

interview and gave short responses. (*Id.* at 8–9.) Among his statements, Conley stated that he only carried the gun for protection. (*Id.* at 9.)

### B.     Defendant's Motions and the R&R

As noted, Conley moves to suppress the items seized from his person, arguing that they were seized in violation of the Fourth Amendment.[1]  Specifically, Conley contends that despite his refusal to receive medical treatment, HCMC protection officers unlawfully seized him, and any evidence obtained as a result of that seizure must be suppressed as fruit of the poisonous tree. (Def.'s Mot. to Suppress Evid. [Doc. No. 23] at 1.)  In addition, he moves to suppress his statements, arguing that they were made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (Def.'s Mot. to Suppress Stmts. [Doc. No. 22] at 1–2.)

In the R&R, Magistrate Judge Thorson recommended the denial of Conley's Motion to Suppress Evidence.  First, she found that the HCMC protection officers were government actors who acted for an "administrative purpose"—factors that made their conduct subject to Fourth Amendment standards, by virtue of the Fourteenth Amendment. (R&R at 11–12.)  Next, Magistrate Judge Thorson found that the HCMC protection officers' seizure of Conley was objectively reasonable, in light of the need to administer

---

[1]     Specifically, he seeks to exclude the following items: a Smith and Wesson .38 caliber revolver; clothing items including a tan "Carhardtt" (sic) jacket, socks, hat, pants, towel, tennis shoes, and underwear; ammunition, including four live .38 caliber cartridges and one .38 caliber casing; mobile telephones and accessories, including an Alcatel cellphone, two cellphone chargers, a damaged Motorola cellphone, and a damaged UMX cellphone; a wallet containing miscellaneous cards; a knife; two house/apartment keys on a red lanyard; suspected crack cocaine (approximately .4 grams); and two blue tablets, as well as all other "fruits of the poisonous tree." (Def.'s Mot. to Suppress Evid. [Doc. No. 23] at 1.)

5

medical care and the exigent circumstances attendant to the medical emergency. (*Id*. at 13–17.) She found that the nature and quality of the intrusion on Conley's Fourth Amendment rights was relatively low, because the seizure was of limited duration, involving a brief physical hold. (*Id*. at 17.) In contrast, she found the Government's interests "weigh[ed] exceedingly high," noting that the intrusion on Conley's liberty was necessary to permit potentially life-saving medical care and to protect the medical personnel from Conley's physical movements. (*Id*. at 17–19.) But even if Conley's seizure were objectively unreasonable, the magistrate judge found that the exclusionary rule would not apply, as the purpose of the rule would not be served by excluding the evidence here. (*Id*. at 20–21.)

As to Conley's Motion to Suppress Statements, Magistrate Judge Thorson categorized his statements into three groups: (1) statements made to medical personnel and others immediately after his seizure; (2) statements made in response to Officer Cain's questions about the shooting incident; and (3) statements made during the interview with Detective Walker. (*Id*. at 22–30.) The magistrate judge found that Conley did not make statements in the first and second categories in response to an interrogation, and that several of these statements were voluntary or fell within the public safety exception to the *Miranda* rule. (*Id*. at 22–27.) However, with respect to the third category—Conley's statements to Detective Walker—Magistrate Judge Thorson found that Conley's waiver was neither knowing nor voluntary, as he made it while he was under the influence of several cognitive-impairing drugs. (*Id.* at 28–30.) Accordingly, she recommended that Conley's Motion to

Suppress Statements be granted with respect to this third category of statements.  (*Id*. at 31.)

### C.  Defendant's Objections to the R&R

Conley objects to several factual findings and legal conclusions in the R&R. Among his objections to the magistrate judge's findings of fact, he takes issue with any characterization that he was engaged in a physical struggle with HCMC protection officers prior to their seizure of him.  (Def.'s Objs. at 5.)  He states that he only physically resisted after the three protection officers restrained him. (*Id*. at 5–6.)  He further objects to the magistrate judge's factual finding that after locating the gun in Conley's jacket pocket and discovering the hole in the pocket, officers concluded that Conley had shot himself.  (*Id*. at 10.)

As to the magistrate judge's legal conclusions, Conley argues that the HCMC protection officers' actions in seizing him were objectively unreasonable.  (*Id*. at 11.)  He argues that he competently refused medical treatment and there was no probable cause to believe that he posed a danger to himself or others.  (*Id*.)  Further, Conley asserts that HCMC engages in a pattern and practice of sedating, secluding, and physically restraining patients who are deemed uncooperative.  (*Id*. at 24–25.)  Conley also contends that the exclusionary rule applies and all of the challenged evidence should be excluded as fruit of the poisonous tree.

In addition, Conley objects to the magistrate judge's recommendation to deny the suppression of two of the categories of statements at issue—statements that he made

immediately after his seizure, and statements in response to questions posed by Officer Cain.  (*Id*. at 1–2; 11.)

In response, the Government contends that Conley merely rehashes arguments that Magistrate Judge Thorson considered and rejected.  (Gov't's Opp'n [Doc. No. 55] at 2.)  It contends that the magistrate judge correctly concluded that restraining Conley was reasonable under the totality of the circumstances and that the exclusionary rule should not apply here.  (*Id*. at 2–5.)

## II.   DISCUSSION

The district court reviews the magistrate judge's recommendations on dispositive matters de novo, undertaking an independent analysis of those portions of the R&R to which a party objects.  28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b)(3).

### A.   Objections to Findings of Fact

While Conley objects to portions of the R&R's findings of fact, (Def.'s Objs. at 3–11), his objections fail to identify errors in the R&R's factual recitation.  Rather, he simply emphasizes certain facts in support of his legal arguments or argues that certain facts remain in dispute.  Two examples are illustrative.  First, as noted earlier, Conley objects to any finding that he was physically resisting the HCMC protection officers prior to his seizure.  (*Id*. at 5–6.)  But the magistrate judge made no such finding.  (R&R at 4–5) (noting, in sequence, that after an HCMC protection officer began to push Conley back on the gurney, Conley kicked and yelled).

Second, Conley objects to the following statement from the R&R, "[A]fter learning that there was a hole in [Mr. Conley's] jacket pocket and one discharged shell from the gun

8

that they retrieved, officers concluded that [Mr. Conley] had shot himself." (Def.'s Objs. at 10) (citing R&R at 7–8). But the evidence on which the R&R relies for that proposition—Deputy Dziekan's bodycam video—clearly supports that statement, because on the video, Deputy Dziekan voices his belief that Conley shot himself. (Def. Ex. 6 at 04:50:10–05:00:13.) It may be the case that Conley did not shoot himself, but the R&R accurately summarizes the evidence.

Because Conley fails to identify any factual errors in the R&R, the Court overrules his objections to the R&R's findings of fact.

### B.   Motion to Suppress Evidence

#### 1.   Whether the Seizure Was Objectively Unreasonable

As noted earlier, Conley objects to Magistrate Judge Thorson's finding that the seizure was objectively reasonable. (Def.'s Objs. at 10–21.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "The application of physical force to the body of a person with intent to restrain is a seizure[.]" *Torres v. Madrid*, 141 S. Ct. 989, 993 (2021). The Court agrees with the magistrate judge that the three HCMC protection officers here effected a seizure of Conley's person when they restrained him on the hospital gurney.[2]

_____

[2] Neither party objects to the magistrate judge's finding (R&R at 11–13) that the actions of the three HCMC protection officers were subject to the Fourth Amendment, applicable to state actors through the Fourteenth Amendment, as the protection officers were government actors who were acting with an "administrative purpose" of assisting medical personnel. *See Buckley v. Hennepin Cnty.*, 9 F. 4th 757, 761 (8th Cir. 2021) (applying Fourth Amendment reasonableness standard to Hennepin County paramedics);

The Fourth Amendment does not prohibit all seizures—only *unreasonable* seizures. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968).  To determine the reasonableness of a seizure, courts must carefully balance the nature and quality of the intrusion on the defendant's Fourth Amendment interests against the governmental interests at stake.  *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

Conley, however, argues that a probable cause standard applies to the determination of reasonableness, relying on *Graham v. Barnette*, 5 F.4th 872, 886 (8th Cir. 2021).  (Def.'s Objs. at 21.)  He contends that under this standard, the Court must consider whether probable cause supported a finding that he was incompetent to refuse medical treatment or was a danger to himself.  (*Id.*)

Magistrate Judge Thorson applied the correct legal standard and the Court disagrees with Conley that a probable cause standard applies.  Conley confuses the central issue here—whether law enforcement found the gun in his pocket through an unconstitutional seizure—with an entirely different question, not at issue here, of whether he received unwanted medical treatment redressable under 42 U.S.C. § 1983.  Accordingly, he cites authority arising under § 1983, which is inapplicable here because he has made no such claim.  In *Graham*, 5 F.4th at 886, a § 1983 action, the Eighth Circuit held that in order for officers to seize a person for an emergency mental health evaluation, there must be probable cause, not simply a reasonable belief, that the person poses a danger to himself or

---

*United States v. Inman*, 558 F.3d 742, 745 (8th Cir. 2009) (stating that a governmental entity must have engaged in the conduct at issue with the intent to assist the government in its investigatory or administrative purposes and not for an independent purpose).

others.  ("We conclude that only probable cause that a person poses an emergent danger—that is, one calling for prompt action—to herself or others can tip the scales of the Fourth Amendment's reasonableness balancing test in favor of the government when it arrests an individual for a mental-health evaluation because only probable cause constitutes a sufficient 'governmental interest' to outweigh a person's 'interest in freedom.'").  Conley's seizure, in which the HCMC protection officers restrained him to assist medical staff in providing medical treatment, was not a seizure that evolved into a mental health arrest.  And importantly, law enforcement officers recovered the gun because an HCMC protection officer felt it while holding Conley down, before any medical treatment occurred.   If Conley believes that he received potentially life-saving treatment against his wishes, the appropriate remedy is a § 1983 action, not a motion to suppress evidence.

In addition, as the magistrate judge observed, (R&R at 14  n.9),  the  site  of  the seizure in *Graham* occurred in the sanctity of the home.  This was of particular importance to the Eighth Circuit, and is factually distinct from Conley's seizure here in a hospital setting.  5 F.4th at 886 ("Our confidence that the Fourth Amendment demands probable cause of dangerousness to effectuate a mental-health arrest in this case is reinforced by the location of this arrest:  Graham's home.").

The Court therefore agrees with the magistrate judge's application of the Fourth Amendment balancing test to determine whether Conley's seizure was objectively reasonable.  (R&R at 14–15.)  With respect to the nature and quality of the intrusion on Conley's Fourth Amendment interests, *see Garner*, 471 U.S. at 8, Magistrate Judge Thorson correctly observed that the intrusion was brief, lasting less than two minutes

before the discovery of the gun in Conley's jacket.  *See Wright v. United States*, 813 F.3d 689, 699 (8th Cir. 2015) (finding a twenty-minute detention not an unreasonable seizure under the Fourth Amendment).  During the initial seizure, the HCMC protection officers used their hands and bodies to restrain Conley, rather than handcuffs or straps.  *See United States v. Oyekan*, 786 F.2d 832, 838 (8th Cir. 1986) (concluding there was no Fourth Amendment violation in part because the search via x-rays was performed "by the least intrusive means possible.")  Accordingly, the nature and quality of the intrusion on Conley's person by the HCMC protection officers was of relatively short duration, and was done to effectuate medical care.  By restraining Conley, the HCMC protection officers were not attempting to search his person, nor did they have any reason to believe that Conley was involved in any illegal activity—they were simply assisting medical staff in providing treatment.

The competing governmental interest at issue, *see Garner*, 471 U.S. at 8, involved the rendering of potentially life-saving medical care.  Medical staff pleaded with Conley to cooperate, explaining the uncertainty of his condition, and the risk of dire consequences. Although the Court does not diminish Conley's Fourth Amendment interest, on balance, the significant governmental interest here outweighs the intrusion on Conley's Fourth Amendment interest.  Accordingly, the Court finds that under the totality of circumstances, the seizure here was not objectively unreasonable.

Conley also takes issue with some of the persuasive authority that Magistrate Judge Thorson cites in the R&R.  Given that Conley relies on § 1983 cases involving Fourth Amendment and due process violations, it is not surprising the magistrate judge addressed

12

such cases and similar authority.  In *Buckley v. Hennepin County*, 9 F.4th 757, 759 (8th Cir. 2021), the Eighth Circuit considered § 1983 claims alleging excessive force and the provision of unwanted medical treatment.  *Id.*  Buckley, who was suffering from depression, threatening self-harm, and had been drinking for two days, objected to paramedics transporting her to the hospital.  *Id.*  After she continued to object, the paramedics handcuffed her, carried her to the ambulance, secured her to a gurney, and injected her with a sedative.  *Id.*  The Eighth Circuit found "[i]t was not objectively unreasonable for paramedics to administer medical aid to an intoxicated, suicidal, semi-conscious woman who needed medical intervention."  *Id.* at 762.

In reaching its conclusion, the court relied on *Thompson v. Cope*, 900 F.3d 414 (7th Cir. 2018), in which the Seventh Circuit observed that "Fourth Amendment restrictions are almost wholly alien to [a] situation, where paramedics are subject to a distinct set of professional standards and goals aimed at responding to medical emergencies."  *Buckley*, 9 F.4th at 761–62 (quoting *Thompson*, 900 F.3d at 423).  In fact, if it were a Fourth Amendment violation to render medical aid, paramedics would face a "Catch-22," requiring them to decide between treating or not treating a patient, but would "face a lawsuit either way."  *Id.* at 762 (quoting *Thompson*, 900 F.3d at 422–23).

Again, the Court observes that § 1983 authority involving unwanted medical treatment arises in a context quite different from the criminal procedure issue here.  The magistrate judge merely relied on *Buckley* as persuasive authority.  And as in *Buckley*, the HCMC protection officers here "were acting as medical responders, not as law enforcement officers."  9 F.4th at 761.  They were faced with the need to assist medical staff in providing

13

treatment to Conley.  Had they failed to act, they ran the risk of civil litigation or potential professional consequences.

Conley also urges the Court to apply *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006), another § 1983 case.  In *Green*, emergency medical workers removed a wheelchair-bound plaintiff who suffered from Lou Gehrig's disease from his home to the hospital, over his objections and the objections of his family members, and injured him during transport.  *Id.* at 69–73. The Second Circuit remanded Green's § 1983 Fourth Amendment claim based on unreasonable seizure, noting that "[f]or a competent adult, dangerousness to oneself justifying such a seizure does not include a refusal to accept medical treatment." *Id*. at 83 (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990)).

But as Magistrate Judge Thorson observed, *Green* is not binding authority on this Court, (R&R at 19 n.13), and again, unwanted medical treatment cases arising under § 1983 do not address the question here of whether law enforcement officers obtained evidence for use in a criminal prosecution by virtue of an unconstitutional seizure.

Conley also faults the R&R's reference to *United States v. Nelson*, 36 F.3d 758, 759 (8th Cir. 1994), for the proposition that exigent circumstances may justify the seizure of a person's body when a medical emergency exists.  (Def.'s Objs. at 14–15) (citing R&R at 16).   Notably, *Nelson* arose in the context of a criminal prosecution, unlike the § 1983 authority that Conley urges the Court to apply.  Conley contends that because the court in *Nelson* concluded that exigent circumstances did not exist under the facts of that case, the

court's statement that "[e]xigent circumstances exist where the delay necessary to obtain a warrant . . . threatens the defendant's life" is mere dicta. (*Id*. at 14.)

Indeed, as Conley states, the Eighth Circuit found no exigent circumstances justified a search via endoscopy in *Nelson*, because even though doctors were concerned about the rupture of a heroin packet inside Nelson's body, "there was no immediate threat nor any emergency procedures conducted to remove the packet." 36 F.3d at 761. However, the Eighth Circuit observed, as a general matter, that warrantless searches upon the human body may be justified by exigent circumstances. *Id.* (citing *Schmerber v. California*, 384 U.S. 757 (1966)). Magistrate Judge Thorson noted that unlike in *Nelson*, the HCMC protection officers here were justified by exigent circumstances to seize Conley because "the medical staff agreed there was an immediate medical threat that required an emergency medical procedure." (R&R at 18–19.) The Court agrees that exigent circumstances justified Conley's seizure.

In sum, the Court finds that the magistrate judge appropriately considered the applicable legal authority, including persuasive authority, and properly analyzed the facts under the Fourth Amendment balancing test. The Court agrees with her analysis and recommendation. Accordingly, the Court finds that the seizure here was not objectively unreasonable and, therefore, did not violate the Fourth Amendment.

## 2.    Whether the Exclusionary Rule Applies

Conley also objects to Magistrate Judge Thorson's finding that even if a Fourth Amendment violation occurred, the exclusionary rule should not apply here. (Def.'s Objs. at 21–26.)

15

When evidence is obtained in violation of the Fourth Amendment, it may be suppressed pursuant to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 906 (1984). To trigger the exclusionary rule, however, the law enforcement conduct in question "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009); *see also Davis v. United States*, 564 U.S. 229, 240 (2011); *United States v. Szczerba*, 897 F.3d 929, 937–38 (8th Cir. 2018).

The Court agrees with the magistrate judge that if the exclusionary rule were applied here, the only deterrent effect would be to discourage HCMC protection officers from assisting medical staff in attempting to provide medical care and to protect medical staff from physical harm. Moreover, the H-SEU's goal, like the protection officers' primary goal, is to create a safe and secure environment for patients, staff, and visitors—not to investigate or prosecute crime. (R&R at 21.) Applying the exclusionary rule here would run counter to its purpose. *See* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 1.8(e) (6th ed.) ("[T]he question of whether the Fourth Amendment is applicable to certain non-police governmental activity and the question of whether the Fourth Amendment's exclusionary rule is applicable to that conduct are not one and the same and might not inevitably be answered in the same way.")

The Court acknowledges Conley's criticism, as reflected more broadly in a newspaper article, that HCMC staff engage in a practice of resorting to the restraint or sedation of patients too hastily. (Def.'s Objs. at 24–25.) However, the Court's focus in the context of a criminal suppression motion, is limited to the facts of this case. Under

16

these facts, even if Conley's seizure violated the Fourth Amendment, application of the exclusionary rule would not effectuate the exclusionary rule's purpose of deterring future violations. Accordingly, the Court denies his motion to suppress evidence on this basis as well.

### C.    Motion to Suppress Statements

As noted earlier, Conley moves to suppress three categories of statements. The magistrate judge recommended that Conley's motion be granted with respect to the statements he made to Detective Walker. Neither party objects to that recommendation. The Court finds that those statements are properly suppressed, and grants Conley's Motion to Suppress Statements in this regard. The Court therefore turns to the remaining two categories of statements.

The Fifth Amendment provides in relevant part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend V. In furtherance of this right, the Supreme Court has held that evidence obtained as a result of a custodial interrogation may only be used against a defendant if he (1) is advised of his rights; and (2) voluntarily, knowingly, and intelligently waives those rights. *Miranda*, 384 U.S. at 444. *Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322 (1994). Custodial interrogation includes not only express questioning, but also any word or action that police should know is "reasonably likely to elicit an incriminating response from the subject." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). *Miranda* does not, however,

17

"protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997).

While Conley appears generally to contest the magistrate judge's findings that the remaining two categories of statements should not be suppressed, (Def.'s Objs. at 2, 11), he presents no specific arguments in his Objections.  With respect to the first category of statements made immediately after Conley's seizure, the Court agrees with the magistrate judge that most of these statements were voluntary and unprompted, and not in response to an interrogation.  *See United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1039 (8th Cir. 2010) (finding defendant's statements were spontaneous, voluntary, and not in response to interrogation, and should not be suppressed).  Regarding Conley's responses to the specific questions about "where the gun was" or if he "had anything else on him," officers' concerns about public safety—and specifically, the safety of everyone in the triage room—required answers to those questions, and Conley's responsive statements need not be suppressed. *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) (noting that public safety exception to *Miranda* permits suspect's non-*Mirandized* answer to a question to be admitted into evidence if purpose of the question was to ensure public safety, not merely to elicit evidence).

Regarding the second category of statements at issue—Conley's responses to Officer Cain's questions regarding the circumstances under which he was shot—the Court likewise agrees that the public safety exception applies.  As Magistrate Judge Thorson observed, a shooting had just occurred, it was possible that a shooter was still at large, and

18

Officer Cain's questions about where the shooting had occurred and who had shot Conley were aimed at ensuring public safety, not eliciting incriminating responses.

For all of the foregoing reasons, the Court therefore denies Conley's Motion to Suppress Statements as it relates to the first and second categories of statements.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1.   The Report and Recommendation [Doc. No. 49] is **ADOPTED**.

2.   Defendant's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 22] is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's statements in response to Officer Walker's interview are suppressed.

3.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 23] is **DENIED**.

Dated: November 22, 2021                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge

19